IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| CRYSTAL C., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:22-cv-00729 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| MARTIN O'MALLEY, | ) | By:    Hon. Thomas T. Cullen |
| Commissioner of Social Security, | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Crystal C. ("Crystal") filed suit in this court seeking review of the Commissioner of Social Security's ("Commissioner") final decision denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401–434, and supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381–1385.[1] Crystal primarily suffers from back problems, carpal tunnel syndrome, and migraines. On review of her application for DIB and SSI, the Commissioner (through an administrative law judge ("ALJ")) concluded that, despite her limitations, Crystal could still perform a range of sedentary work, with additional limitations. Crystal challenges that conclusion and, after careful review of the record, the court finds that the ALJ's written decision is legally deficient in several material respects. Accordingly, the Commissioner's

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Under Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. *See also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

decision will be reversed and this case will be remanded to the Commissioner for further proceedings.

## I.   STANDARD OF REVIEW

The Social Security Act authorizes this court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The court's role, however, is limited; it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted). Instead, the court, in reviewing the merits of the Commissioner's final decision, asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 99–100 (1991)).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (cleaned up). It is "more than a mere scintilla" of evidence, *id.*, but not "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005) (per curiam) (internal quotation omitted). But "[a] factual finding

by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) has been working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to past relevant work (if any) based on her residual functional capacity ("RFC"); and, if not, (5) whether she can perform other work. See *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II.   PROCEDURAL HISTORY AND RELEVANT EVIDENCE

On March 4, 2020, Crystal protectively filed an application for DIB and SSI, alleging disability beginning on August 16, 2019. (*See* R. 529, 537.) At the time, she alleged disability based on her back issues (cervical and lumbar region), spondylitis, depression, anxiety, and panic attacks. (R. 570.) Her application was denied initially and upon reconsideration. (R. 383–410; 417–40.) Crystal sought review of those decisions and, along with her counsel, appeared before ALJ David Lewandowski on October 20, 2021. (R. 233–67.) After considering the

relevant evidence, medical records (including those submitted after the hearing), and hearing testimony, the ALJ issued an unfavorable decision on February 25, 2022. (R. 205–26.) The ALJ concluded that Crystal suffered from several severe impairments but that she retained the RFC to perform sedentary work with additional limitations. Because Crystal could perform her past relevant work as a receptionist (as that job is generally performed, but not as she performed it in her past relevant work), the ALJ determined that she was not disabled within the meaning of the Act. (*Id.*)

## A.    Legal Framework

A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite her medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The ALJ determines the claimant's RFC between steps three and four of the five-step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step 2 concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v.*

*Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should reflect credibly established "restrictions caused by medical impairments and their related symptoms"—including those that the ALJ found 'non-severe'—that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1, *2.

Second, the RFC assessment must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion," SSR 96-8p, 1996 WL 374184, at *7, and must logically explain how the ALJ weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311–12. Generally, a reviewing court will affirm the ALJ's RFC findings when he or she considered all the relevant evidence under the correct legal standards, and the written decision built an "accurate and logical bridge from the evidence to his [or her] conclusion[s]." *See Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017) (cleaned up); *Shinaberry v. Saul*, 952 F.3d 113, 123–24 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662–63.

## B.    Medical Evidence

Because the court finds that remand is warranted primarily based on the ALJ's wanting treatment of Crystal's carpal tunnel syndrome and her headaches, the court's recitation of the medical evidence focuses on those two severe impairments. (*See* R. 208 (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)).).

On October 14, 2019, Crystal had an  appointment with Shirley Petreye, NP, wherein she complained about "chronic back pain resulting in [a] migraine" headache. (R. 794.) She also reported "carpal tunnel pain," but told Nurse Petreye that she was going to start wearing

"her wrist braces" to combat the pain. (*Id.*) Crystal was referred to orthopedics for a "series of spinal injections" for her back and was referred to physical therapy for her hand pain. (R. 796.)

On February 26, 2020, Crystal reported to the Giles Community Hospital emergency department ("ED") with a "headache described as radiating from the posterior occipital skull up and around to the frontal sinuses" that was not responsive to pain medications, including Voltaren gel and a Lidocaine patch. (R. 732.) She reported that she had been seeing "flashes of light on and off due to her headache, which happens a lot." (*Id.*) She reported that the headache started a week ago, but "that she thought she could 'tough [it] out' but it worsened over the weekend . . . ." (*Id.*) When Crystal's primary care provider could not work her in, she was referred to the ED for treatment. She was given a Toradol IV for the pain, although it provided "minimal headache relief," and was discharged with a "limited dose of Fioricet." (R. 734–35.)

On July 30, 2020, Crystal saw her primary care provider ("PCP"), Family Nurse Practitioner ("FNP") Morgan Akers. Her primary reason for the appointment was "[s]welling/joints/hands." (R. 1594.) She reported that she had been "having pain in the joints, specifically to her hands." (R. 1595.) FNP Akers ordered "lab work for further investigation." (*Id.*)

Crystal saw FNP Akers again on September 4, 2020. (R. 1584.) Crystal reported that she had "been having frequent migraines for the past 2–3 weeks." (R. 1585.) FNP Akers prescribed Imitrex for her headaches and advised her that she could return to the office for a Toradol injection if needed. (*Id.*)

On September 20, Crystal was seen at the Roanoke Memorial Hospital ED for her headaches. (R. 1378–79.) Crystal reported that her headache started 6 weeks prior, was "constant, waxing and waning, throbbing and pulsatile," and was "[a]ssociated with blurry vision and photophobia/phonophobia." (R. 1379.) She said her present headache was "[n]ot like her usual migraines," which "knock [her] out"; this migraine was "moderate and longer." (*Id.*) She also reported that Imitrex did not help and that she had seen her PCP on September 8 for Toradol, but that was also ineffective. (*Id.*) A CT scan was performed, but the impression was "unremarkable." (R. 1382–83.) She was given Fioricet, which resulted on only mild improvement, Toradol, reglan, Benadryl, and decadron, and her headache was "much improved." (R. 1385.) Crystal was discharged with instructions for further evaluation and treatment. (*Id.*)

On September 25, Crystal returned to FNP Akers to discuss her headaches. (R. 1579.) She complained about their frequency—she reported migraines "almost daily"—and noted that the Imitrex was ineffective at stopping them. (R. 1579–80.) Crystal and FNP Akers discussed Fioricet "as a rescue medication" and Topamax as a preventative medication, which Crystal said she would like to try. (R. 1579) FNP Akers also referred Crystal for a neurological evaluation. (*Id.*)

On October 5, Crystal saw Isabelle Webb, Certified Medical Assistant, for pain management related to her back pain. (R. 1363.) At this appointment, Crystal relayed that she had been homeschooling her grandson, which had "worsened her carpal tunnel." (*Id.*)

Crystal returned to FNP Akers on October 9, 2020. (R. 1573–75.) Crystal reported that the Topamax appeared to be working well at controlling the frequency of her migraines, and she was continued on that medication. (*Id.*)

The next week, however, Crystal's migraines "significantly increased." (R. 1570.) A Toradol shot the day before reportedly helped, but it did not completely relieve the headache. (R. 1571.) FNP Akers increased her Topamax prescription. (R. 1570.)

Crystal saw Nurse Practitioner ("NP") Sarah Carrigan, a neurology specialist, on December 17, 2020. (R. 1335–39.) She reported that she had migraines in the 1980s and 90s "associated with menses," but they stopped in 2005 after a partial hysterectomy. (R. 1336.) Crystal reported that a "mental breakdown" in August 2018 "triggered headaches restarting," and they "[w]orsened about 6–7 months ago." (*Id.*) NP Carrigan started Crystal on Emgality and planned to taper her off Topamax if the Emgality was effective because the Topamax had been causing "some cognitive dysfunction and word finding difficulty." (R. 1339.) NP Carrigan also continued Crystal on Fioricet. (*Id.*) Crystal was instructed to follow up in two months or sooner if her symptoms worsened. (*Id.*)

The next day, Crystal saw FNP Akers again. She reported that she had been started on Emgality and was to continue on her Topamax for the time being. (R. 1548.) FNP Akers also added amitriptyline hydrochloride to her medications. Crystal had been on Remeron for her depression and sleep issues, but FNP Akers believed the amitriptyline would help Crystal with her sleep issues and "has the added benefit of possibly helping migraines . . . ." (*Id.*)

On January 6, 2021, Crystal went to the Giles Community Hospital ED because of a migraine that had lasted for three days. (R. 1641.) Her Fioricet was not working, she was

experiencing light and noise sensitivity, and she was nauseous. (*Id.*) Crystal reported that her pain was 9/10. (*Id.*) Crystal was given fluids and a "migraine cocktail" and reported feeling much better. (R. 1647.) She was discharged with instructions to return to the ED if her symptoms worsened.

On January 22, Crystal saw FNP Akers again. She reported "lessened" migraines on the Emgality[2] and amitriptyline but had been sleeping worse since the Remeron was discontinued, so FNP Akers increased her amitriptyline dosage. (R. 1745.) At the time, Crystal was still on Topamax. (*Id.*)

Crystal had a follow up with NP Carrigan on February 22. At this appointment, she described suffering from three types of headaches. She described the first type as feeling the pain was "like a cap on [her] head" and was exacerbated by bending over. (R. 1978.) She is often nauseous, occasionally vomits, and experiences light and sound sensitivity during these types of headaches, and they occur approximately once per week and last 4–5 hours. (R. 1978.)

The second type starts at the base of her neck and "radiates behind both ears." (R. 1979.) These headaches are often accompanied by blurred vision and a "scintillating scotoma" and are occasionally accompanied by nausea and vomiting. (*Id.*) These headaches occur once per week and last more than 5 hours. (*Id.*) Fioricet is often successful in alleviating this type of headache, and Crystal reported that they usually dissipated within 60–90 minutes of taking it. (*Id.*)

---

[2] Crystal reported that she had only recently started the Emgality "due to taking time to have [it authorized] through her insurance." (R. 1745.)

The third type begins with "right retro orbital pressure, spreads to the left," and is "associated with lethargy." (*Id.*) When the pain is severe, Crystal reported she would experience confusion. These headaches occur twice per week and "last[] all day." (*Id.*)

NP Carrigan noted that, since starting Emgality, Crystal had "not noticed a big difference in [her] headache pattern, but [had] noticed that she [was] using abortive medications less frequently" and that the headaches were "less severe." (*Id.*) NP Carrigan continued Crystal on her current medication—including Topamax—and noted that Crystal should "consider Botox." (R. 1983.) Crystal was directed to follow up in 3–4 months or sooner if needed. (*Id.*)

In June of 2021, FNP Akers begin weaning Crystal off of Topamax to address several gastrointestinal issues that FNP Akers thought may be caused by "the combinations of so many medications maybe what is causing her nausea and vomiting." (R. 1682.) Crystal agreed to this plan.

On July 14, 2021, FNP Akers gave Crystal another Toradol injection for migraine relief. (R. 1694.) Crystal received a second shot five days later. (R. 1692.)

At her July 23 appointment with FNP Akers, Crystal reported that, since discontinuing Topamax, she had "had significantly more migraines." (R. 1689.) FNP Akers restarted Crystal on Topamax at her prior dosage. (R. 1688.)

On August 27, 2021, Crystal saw NP Carrigan again. (R. 1963–67.) Crystal reported that she was having migraines two to four times per week, three "of which are severe." (R. 1964.) She was taking Fioricet once a week and did "not feel that Emgality has been beneficial." (*Id.*) NP Carrigan noted that Crystal was taking amitriptyline for sleep but that it

had "not helped with headaches." (*Id.*) Dr. Carrigan discontinued Crystal's Emgality, continued her Topamax, and referred her for Botox. (R. 1967.)

Crystal had her first round of Botox injections for her migraines on September 9, 2021. (R. 1950–51.) The procedure notes indicate that oral preventative measures had been ineffective and that Crystal experienced "migraine headaches occurring greater than 15 days per month, lasting longer than four hours . . . ." (R. 1950.) Crystal handled the procedure well and was instructed to return for a second round in "no sooner than 90 days." (R. 1951.)

Crystal received her second Botox injection on December 14, 2021. (R. 1998–99.) The procedure note states that Crystal "experience[d] reduction in headaches more than 100 hours per month due to clinical effectiveness of" her first injection. (R. 1998.) Crystal's "baseline headache days" were noted as 15, and her "current headache days" were 10–12. (*Id.*) She was noted to have tolerated the procedure well and follow up injections were to be "scheduled no sooner than 90 days" from that date. (R. 1999.)

## C.   Opinion Evidence

As part of her application for DIB and SSI, Crystal underwent a consultative physical exam with Deidre Parsley, D.O., on September 17, 2020. The examiner noted that Crystal has "tenderness of the ventral wrists," a positive Tinel's sign bilaterally, a negative Phalen's test bilaterally, and 4/5 grip strength bilaterally. (R. 1302.) Dr. Parsley noted that Crystal "is able to write and pickup coins with either hand without difficulty." (*Id.*) She opined that Crystal suffered from carpal tunnel syndrome and right cubital tunnel syndrome and that, in a normal workday, she could "grasp, grip, handle, [and] feel occasionally." (R. 1303.)

Crystal's application for DIB and SSI was reviewed by state agency examiner Dr. Nicolas Tolou on September 28, 2020. After a review of her medical records, Dr. Tolou opined that Crystal was limited in her ability to push and/or pull with her upper extremities and stated that she was limited to "frequent" handling, fingering, and feeling with both her hands due to carpal tunnel syndrome. (R. 392–93.) At the reconsideration level, Dr. Jack Hutcheson, Jr. concurred with Dr. Tolou's limitation to "frequent" handling, fingering, and feeling. (*See* R. 425.)

In a questionnaire sent to her by Crystal's attorney, FNP Akers opined on December 9, 2020, that Crystal was suffering from migraines, that her symptoms were "severe enough to interfere with attention and concentration," and that Crystal would "likely . . . be absent from work as a result of the impairments . . . [m]ore than four times a month." (R. 1311.) She also noted that Crystal was "struggling with coordination and balance," was "having frequent migraines," and was having "[d]ifficulty with activities of daily living." (R. 1312.)

In a similar questionnaire completed on September 30, 2021,NP Carrigan stated that Crystal suffered from three types of headaches and that they often caused vertigo, nausea/vomiting, malaise, photosensitivity, visual disturbances and mental confusion/inability to concentrate. (R. 1909–10.) Her headaches would occur four times per week and last 4–5 hours each. (R. 1909) She also noted that medication, "[l]ying in a dark room," and "[c]old/hot packs" made the headaches better. (*Id.*) During the headaches, Dr. Carrigan stated that Crystal would be "precluded from performing even basic work activities" and would need "unscheduled breaks" from the workplace 2–4 times per week as a result. (R. 1909–10.) And

like FNP Akers, she opined that Crystal would "likely . . . be absent from work as a result of the impairments . . . [m]ore than four times a month." (R. 1910.)

## D.   Functional Reports

In a Function Report dated May 8, 2020, Crystal relayed that she cannot hold her arms up because of pain in her spine and that her husband has to help her put on jewelry because of the pain in her arms and hands. (R. 583.) She stated that she could only use her hands for "5 minutes" because of pain. (R. 587.) She also noted that she was prescribed "wrist braces . . . years ago" and that she uses them "daily." (R. 588.)

In an update to her first Function Report, dated November 13, 2020, Crystal noted a decrease in motor skills and coordination resulting in tripping issues associated with migraines. (R. 612.)

In a second Function Report dated January 11, 2021, Crystal reported that she has "frequent migraines that put [her] completely down . . . ." (R. 630.) She also noted—as she did in her testimony—that if she wakes with a migraine, she usually has to take medicine and return to bed. (R. 631; *see also* R. 247.) She relayed that she has carpal tunnel syndrome "that affects [her] motor skills" and that she has comprehension issues that may be due to her medication regimen. (R. 633.) She also stated that "anything that requires[her] use of motor skills is very difficult" and she has "great difficulty using [her] hands . . . ." (R. 634, 637.)

In an update to her second Function Report, dated March 12, 2021, Crystal noted again that she was being treated for migraines. (R. 643.)

### E.    Relevant Testimony

At a hearing before the ALJ on October 20, 2021, Crystal testified she has had bilateral carpal tunnel syndrome since 2014 and that she experiences "flare-ups" from it. (R. 246–47.) She stated she has "trouble working with smaller things" and "trouble with gripping things and especially with [her] left because there's diminished strength in [her] left more than the right." (R. 244.) She also said that she could not use her arms and hands more than "maybe 20 minutes or so" or her "strength would go out completely." (R. 245.)

She also testified that she experiences two to four headaches per week with "one or two of those being very severe on a real bad day."[3] (R. 247.) She described that they "[u]sually" last "all day" and that, if she lays down to try to alleviate them, she still has a "dull headache" for the rest of the day. (R. 248.) "Manageable" headaches—ones where she "can stay up"— last for "six to eight hours" and, although she is up and "trying to function" during them, "they are still there." (*Id.*)

She also testified that the medication she takes for her headaches "makes [her] a little out of it" and that she does not "perform any duties" while on the medicine because it "kind of makes [her] . . . like a little zombie." (*Id.*) She reported that the Emgality was ineffective and that her first found of Botox injections has occurred the month prior, but that she was "still having those headaches like that." (R. 250.) When asked if "anything she's tried thus far has given [her] an appreciable relief to the headaches," she replied, "No, sir, it has not." (R. 249.)

---

[3] The court notes that this testimony aligns with the "baseline headaches" reported in the Botox procedure note and the description of her headaches relayed to Dr. Carrigan. (*See* R. 1978–79; 1998.)

F.    **The ALJ's Opinion**

In his written decision, the ALJ concluded that Crystal suffered from the following severe impairments: cervical spondylosis, lumbar degenerative changes, obesity, carpal tunnel syndrome, right cubital tunnel syndrome, and headaches. (R. 208.) He found, however, that Crystal did not suffer from "an impairment or combination of impairments" that met or medically equaled one of the listed impairments in the applicable regulations. (R. 214.) After "careful consideration of the entire record," the ALJ found that Crystal has the RFC to perform sedentary work, *see* 20 C.F.R §§ 404.1567(a), 416.967(a), except that she

> can perform occasional postural activities. She can frequently perform reaching, handling, fingering, and feeling. She should avoid exposure to loud noise such as heavy traffic and to bright lights, but an office setting is allowable. She should avoid concentrated exposure to vibrations and industrial hazards.

(R. 215.) As a result, the ALJ determined that Crystal could perform her past relevant work as a receptionist (as generally performed) and that she, therefore, was not under a disability from August 16, 2019, though February 25, 2022. (R. 225–26.)

## III.    <u>ANALYSIS</u>

Crystal argues that the ALJ's decision cannot stand because it does not include a proper RFC analysis or evaluation of the record evidence. The court agrees. The ALJ's discussion of several important issues—specifically, his explanation of Crystal's RFC, the limitations to account for her carpal tunnel syndrome, and the analysis of her migraines—is deficient. Because his lack of analysis or explanation on these points frustrates meaningful review, the court must reverse his decision and remand this case for further proceedings consistent with this Opinion.

A.      **Crystal's RFC**

In determining a claimant's RFC, the "ALJ must consider all of the claimant's physical and mental impairments, severe and otherwise, and determine, on a function-by-function basis, how they affect the claimant's ability to work." *Thomas*, 916 F.3d at 311 (cleaned up). The ALJ must provide "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8P, 1996 WL 374184, at *7; *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). As distilled by the Fourth Circuit, "a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas*, 916 F.3d at 311. The second component requires the ALJ's narrative to "build an accurate and logical bridge" from the evidence in the record to the RFC conclusions. *Monroe*, 826 F.3d at 189 (cleaned up). That bridge does not need to be perfectly crafted and "specifically refer to every piece of evidence," *Reid v. Comm'r of Soc. Sec. Admin.*, 769 F.3d 861, 865 (4th Cir. 2014) (internal quotation omitted), but it does need to allow for "meaningful review," *Mascio*, 780 F.3d at 636.

Here, the ALJ's discussion of Crystal's RFC has 2 out of the 3 elements: evidence and conclusion. But he fails to provide a "logical explanation" for why the evidence leads to his conclusion. His analysis is perfunctory and "offer[s] nothing to reveal *why* he was making his decision." *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015). Rather, the ALJ went "straight from listing evidence to stating a conclusion," a failure that frustrates meaningful review. *Thomas*, 916 at 311.

The ALJ's discussion of Crystal's RFC does an admirable job of listing the relevant medical evidence, it but is devoid of analysis as to how or why the relevant medical evidence

establishes that Crystal can perform work at the sedentary level. Under the applicable regulations, sedentary work

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1657(a), 416.967(a). In addition to those specific requirements, the ALJ imposed additional limitations on Crystal, including that she

> can perform occasional postural activities[;] . . . can frequently perform reaching, handling, fingering, and feeling[;] . . . should avoid exposure to loud noise such as heavy traffic and to bright lights, but an office setting is allowable[; and] . . . should avoid concentrated exposure to vibrations and industrial hazards.

(R. 215.) These conclusions may well be reasonable, but what's missing throughout the ALJ's decision is a cogent explanation of how the medical evidence informs these conclusions—the requisite "logical bridge" between the evidence and the conclusions.

The ALJ's analysis of the relevant medical opinion evidence highlights this deficiency. The ALJ finds unpersuasive the opinions that contradict his conclusion of sedentary work, but he offers no analysis as to *why* they are unpersuasive. Even if the court were to conclude that the ALJ's review of the opinion evidence complied with 20 C.F.R. § 404.1520c,[4] the ALJ's discussion works backwards from a conclusion, rejecting any opinion that contradicts that

---

[4] Except for the limited criticism of the ALJ's treatment of Dr. Deirdre Parsley's opinion, *see infra* § III.B, the court makes no judgment on if the ALJ's analysis of the medical-opinion evidence complied with the requirements of 20 C.F.R. § 404.1520c.

conclusion without sufficient analysis. For example, the ALJ found that the opinions of the state agency physicians were "not persuasive" because "the record supports the need for additional limitations to sedentary exertion work with occasional postural activities." (R. 223.) In other words, the opinions are "not persuasive" because they do not align with the conclusion the ALJ reached. That impermissibly "gets things backwards." See *Sharrie B. v. Kijakazi*, No. 5:22-cv-00007, 2023 WL 8905206, at *10 (W.D. Va. Dec. 27, 2023) (Report and Recommendation) (citing *Mascio*, 780 F.3d at 639).[5] To be sure, the ALJ lists the following record evidence and conclusion when discussing the opinions of the state agency physicians:

> [Crystal's] objective examination findings showed slightly reduced strength, limited range of motion, and tenderness to palpation at times regarding her cervical and lumbar degenerative disc disease. She had routine follow-up with a pain management provider and interventions including epidural steroid injections, medial branch blocks, and radiofrequency ablations, *which support the above-described residual functional capacity.*

(R. 223 (emphasis added).) But the court remains left to guess as to *how* or *why* that evidence supports the ALJ's RFC determination. Instead, the ALJ went "straight from listing evidence to stating a conclusion." *Thomas*, 916 F.3d at 311. This was error and requires that this case be remanded.

## B.   Crystal's Carpal Tunnel Syndrome

The ALJ determined that Crystal's carpal tunnel syndrome qualified as a severe impairment and, accordingly, he included a limitation to "frequent reaching, handling, fingering, and feeling." (R. 222.) His explanation for this limitation is also insufficient.

---

[5] This report and recommendation was adopted by the court on January 16, 2024, but it is not available on any electronic reporter. (*See* Order, No. 5:20-cv-00007 (W.D. Va. Jan. 16, 2024) [ECF No. 20].)

From the court's perspective, the ALJ attempts to justify this limitation as follows:

> Deirdre Parsley, D.O., the physical consultative examiner, opined the claimant could . . . grasp, grip, handle, and feel occasionally . . . . This opinion is not persuasive. It is not supported by her objective examination findings . . . . For example, she noted the claimant had 4/5 grip strength and tenderness in her wrists and right elbow, but there was no atrophy, she was able to make a fist bilaterally, and she was able to write and pick up coins with either hand without difficulty. These findings do not support a restriction to occasional manipulative activities.

(R. 223.) This analysis is lacking and the conclusion seems, frankly, illogical in light of the record evidence. Carpal tunnel syndrome is known to be a repetitive-stress injury, in that pain increases and strength decreases the more one uses his or her hands and that, as a result, patients are ordinarily limited in or precluded from repetitive work. *See, e.g.*, *Surette v. Berryhill*, No. 4:17-cv-134, 2018 WL 3999815, at *2 (E.D.N.C. Aug. 21, 2018); *Lawson v. Berryhill*, No. 1:16-cv-369, 2017 WL 3995582, at *5 (M.D.N.C. Sept. 8, 2017); *Snider v. Colvin*, No. 7:13-cv-30, 2014 WL 4923172, at *12 (W.D. Va. Sept. 29, 2014); *Blevins v. Astrue*, No. 1:10-cv-54, 2012 WL 1038805, at *3, 7 (W.D. Va. Mar. 28, 2012); *McMichael v. Astrue*, No. 7:09-cv-84, 2010 WL 2691579, at *5 (E.D.N.C. July 6, 2010); *Powers v. Astrue*, No. 2:09-cv-52, 2010 WL 1816250, at *2 (W.D. Va. May 5, 2010); *Hickson v. Astrue*, No. 1:07-cv-00295, 2008 WL 4509440, at *5, 12 (Sept. 30, 2008).

Here, the ALJ apparently concluded that, because Crystal was able to make a fist, write, and pick up coins during a single consultative exam, she would have no difficulty performing those tasks "frequently" over an 8-hour workday, 5 days a week. But the fact that Crystal could do those things once does not mean, *ipso facto*—and especially in light of her carpal tunnel syndrome—that she can perform them repeatedly without issue. *Cf. Woods v. Berryhill*, 888 F.3d

686, 694 (4th Cir. 2018) (noting, as it relates to activities of daily living, that "[a]n ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them" (citing *Brown*, 873 F.3d at 263)), *superseded on other grounds as recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023). And considering Crystal's testimony that, after 20 minutes of using her hands, her "strength would go out completely" (R. 245), the ALJ's analysis does not appear to have adequately considered all the relevant evidence. If he did, he failed to build an "accurate and logical bridge" between that evidence and his conclusions. *Monroe*, 826 F.3d at 189.

In sum, although the ALJ claims to have taken "plaintiff's manipulative limitations and hand use restrictions into account," *Spencley v. Colvin*, No. 7:13-cv-231, 2014 WL 2199828, at *4 (W.D. Va. May 27, 2014), his analysis and explanation for how Crystal's RFC accounts for these limitations are lacking. Remand is necessary to squarely address this issue.[6]

## C.    Crystal's Headaches

Finally, the ALJ's discussion and analysis of Crystal's headaches are insufficient. Although the ALJ found that Crystal's headaches constituted a severe impairment (*see* R. 208), his accounting for them in Crystal's RFC is again inadequate.

The ALJ attempted to explain how he accounted for Crystal's headaches in her RFC:

> The claimant also alleged headaches and sought treatment in the emergency room at times for migraines and complaints of sound and light sensitivity. She treated with a neurologist and noted she did not think Emgality was beneficial in August 2021. She began Botox treatments the next month and reported reduction in headaches due to the effectiveness of the injections from her

---

[6] The court notes that, although carpal tunnel syndrome is a repetitive-stress injury, the ALJ may very well be correct that Crystal can reach, finger, and handle "frequently." His justification for that conclusion in his written opinion, however, is insufficient.

prior visit. Her restriction to avoiding exposure to loud noise such as heavy traffic and to bright lights, but an office setting is allowable, provides for her headache complaints that are consistent with the record.

(R. 222.) The ALJ also noted that the treatment records from Crystal's Botox treatments indicate that, at her second round of Botox, "she reported 'reduction in headaches more than 100 hours per month due to clinical effectiveness of the injections.'" (R. 220 (citing R. 1998).)

But these statements do not explain how limiting Crystal's exposure to loud noises and bright lights accounts for the severe impairment of her chronic, debilitating headaches. While the record establishes a reduction in the *frequency* of her headaches, it says nothing about the effectiveness of the treatment on the *severity* of those headaches when they do occur. If, as is possible based on the court's view of the record, Crystal now suffers "only" 10–12 headaches a month, but many still last more than 4 hours each, the ALJ was obligated to consider that when determining Crystal's RFC, especially since he found that her headaches were severe, meaning that they "significantly limit[ her] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). And he must explain how headaches that limit Crystal's ability to do "basic work activities" and which occur for tens, if not hundreds, of hours per month are adequately accounted for in his RFC.[7] *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

---

[7] Mindful that the court must read the ALJ's decision "as a whole," *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018), the court credits that the ALJ did discuss other treatments that Crystal received for her headaches. (*See* R. 219–20.) But this evidence does not support the ALJ's conclusion; it suggests that Crystal was not receiving relief from her symptoms. Although she was started on Emgality and reported that her headaches were less severe, she later stated—as the ALJ accurately reported—that she no longer believed the Emgality was working. (*See* R. 222, 1964.) At an August 2021 appointment with her neurologist, Crystal reported three severe headaches per week, a constant dull headache, and "issues with memory loss and word finding difficulty." (R. 1964.)

Although the court recognizes and agrees that an ALJ "need not specifically reference every piece of evidence in his decision," *Larry W. v. Saul*, No. SAG-19-3089, 2020 WL 13605076, at *2 (D. Md. Nov. 16, 2020), the ALJ must provide more of an explanation here to show that his decision applied the correct legal standards and is based on substantial evidence.[8]

## IV.   CONCLUSION

The ALJ's decision insufficiently explains his conclusion on several key issues. These failures frustrate judicial review and, accordingly, this case must be remanded to the Commissioner for further proceedings. *See* 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.").

---

[8] Given the extensive medical history indicating the lack of relief for her headaches, the court is dubious of the evidence specifically cited by the ALJ in support of the RFC limitation to account for Crystal's migraines: the Botox procedure note that indicates her first injection was effective in reducing her migraines by "more than 100 hours per month." (R. 1998.) But Crystal's reports to NP Carrigan call into question whether such a dramatic reduction is possible. Crystal reported that she experienced three types of headaches: type 1 occurred once per week and lasted 4–5 hours; type 2 occurred once per week and lasted more than 5 hours (but would dissipate within 60–90 minutes of taking Fioricet); and type 3 occurred twice per week and lasted "all day." (*See* R. 1978–79.) At the appointment for her second injection, the treatment notes her headaches were down to 10–12 per week, from a baseline of 15 per week. (R. 1998.) While it is possible that the Botox injections were effective at stopping 3–5 of Crystal's "all day" headaches, such a marked reduction requires, at least, a critical eye and further explanation by the ALJ in his opinion—*especially* because Crystal disclaimed any effectiveness in her sworn testimony on October 20, 2021, approximately one month after her first Botox injections. (*See* R. 249–50.)

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 29th day of March, 2024.

_/s/ Thomas T. Cullen_
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE